ELIZABETH M. JEFFERY ET AL. *v.* PLANNING AND ZONING BOARD OF APPEALS OF THE TOWN OF GREENWICH ET AL.

KING, C. J., ALCORN, HOUSE, THIM and RYAN, JS.

Argued June 7—decided July 26, 1967

*George W. Scott, Jr.,* with whom were *Robert C. Barnum, Jr.,* and, on the brief, *Norman E. Davis,* for the appellants (plaintiffs).

*Orson L. St. John,* for the appellee (defendant Young Women's Christian Association of Greenwich, Connecticut, Inc.).

*Joseph A. Izzillo,* for the appellee (named defendant).

KING, C. J. This is an appeal from a decision of the defendant planning and zoning board of appeals of Greenwich, hereinafter referred to as the board, which, after a hearing, granted an application of the Young Women's Christian Association of Greenwich, Connecticut, Inc., hereinafter referred to as the Y.W.C.A., for a special exception to permit the construction of a building and other facilities on a

tract of land zoned for single-family residences.[1] The subject property fronts on the Boston Post Road, which is a heavily traveled main highway known as United States route 1, having a daily traffic volume of about 17,000 motor vehicles. The plaintiffs herein own and reside in single-family houses in the vicinity of, and largely in the rear of, the subject tract. The Greenwich zoning regulations are of a permissive, rather than a prohibitory, nature. Therefore, the Y.W.C.A. application was validly granted if, but only if, some portion of the regulations expressly permits the uses proposed for the land in question. See cases such as *Park Regional Corporation* v. *Town Plan & Zoning Commission,* 144 Conn. 677, 682, 136 A.2d 785; see also "The Connecticut Law of Zoning," 41 Conn. B.J., pp. 262, 264.

Section 6 (a) of the Greenwich zoning regulations provides as follows as to uses in R-12 and R-20 zones: "The following principal uses are permitted and all other principal uses are expressly excluded. (1) Detached single family dwellings, one per lot. (2) The following uses when authorized by the Board of Appeals as special exceptions: . . . (b) Clubs, recreational areas and fall-out shelters not open to the general public and not operated for commercial profit, and community centers operated by civic associations. . . . (f) Churches; educational institutions not operated for commercial profit. . . ." Subdivisions (b) and (f) were the only portions of § 6 (a) (2) relied upon by the Y.W.C.A. in its application for the special exception.

[1] The uses allowed as special exceptions in R-12 and R-20 zones are the same. Therefore, the fact that the subject tract lies partly in an R-12 zone and partly in an R-20 zone is immaterial in the decision of this case.

## I

The board, in granting the special exception, found that the Y.W.C.A. is "a non-profit club devoted to recreational, educational and religious purposes for its members and guests." It thus clearly appears that the board granted the special exception under the provisions of subdivision (b) of § 6 (a) (2) on the ground that the applicant's proposed use was that of a club.[2] The plaintiffs claim that the Y.W.C.A. is not a club and that its proposed uses are not those of a club.

The word "clubs" is not defined in the zoning regulations, but, whether defined or not, its meaning is a question of law. *Schwab* v. *Zoning Board of Appeals,* 154 Conn. 479, 482, 226 A.2d 506; *Park Regional Corporation* v. *Town Planning & Zoning Commission,* supra, 684; *Langbein* v. *Board of Zoning Appeals,* 135 Conn. 575, 579, 67 A.2d 5. Whether on the evidence the Y.W.C.A. qualified under the legal meaning of the word "club" was a question of fact to be determined by the board, subject to a review of the reasonableness of its conclusion.

The plaintiffs claim that the word "club" must be construed to refer only to "[l]imited membership clubs of restricted size, whose membership . . . [is] limited by traditional committee or ballot methods", and that this construction is required by the statutory history of § 6 (a) (2) (b). This claim is without merit. Indeed, the statutory history requires a contrary construction. Formerly, the regulations

---

[2] Of course, zoning is concerned with the use, rather than with the ownership, of property. See cases such as *State ex rel. LaVoie* v. *Building Commission,* 135 Conn. 415, 419, 65 A.2d 165; *Abbadessa* v. *Board of Zoning Appeals,* 134 Conn. 28, 32, 54 A.2d 675. Thus, the basic question is whether the proposed use by the Y.W.C.A. is that of a club.

authorized "[c]ountry clubs, yacht clubs, hunt clubs, riding clubs . . . and other clubs of similar character, and not open to the general public and not operated for commercial profit". See *Shulman* v. *Zoning Board of Appeals,* 154 Conn. 426, 427, 226 A.2d 380. The section was subsequently amended by eliminating the recital of the various types of clubs and substituting the single word "clubs". Clearly, the amendment broadened the scope of the regulation to encompass all clubs, subject to the two limitations retained in the present regulation that the club facilities (1) not be open to the general public and (2) not be operated for commercial profit.

The word "club" has been defined as "an association of persons for social and recreational purposes or for the promotion of some common object (as literature, science, political activity) . . . [usually] jointly supported and meeting periodically, membership in social clubs . . . [usually] being conferred by ballot and carrying the privilege of use of the club property." Webster, Third New International Dictionary, p. 430; see, generally, note, 52 A.L.R.2d 1098, 1100 § 2, 1101 § 4, and 5 Later Case Service 224. The word "club" has a very broad meaning.[3] Almost any group of persons would qualify as a club if it has (1) an organizational structure and (2) some distinct purpose or purposes, such as the recreational, educational and religious purposes, which the board found the Y.W.C.A. to have.

---

[3] Connecticut cases concerned with the definition of a club include *Dooley* v. *Town Plan & Zoning Commission,* 151 Conn. 304, 309, 197 A.2d 770; *Gilbert* v. *Hamden,* 135 Conn. 630, 635, 68 A.2d 157; *Meserole* v. *Liquor Control Commission,* 125 Conn. 104, 107, 3 A.2d 664.

### (a)

There can be no question that the Y.W.C.A. possesses the organizational structure of a club. Its articles of association, constitution, and bylaws demonstrate that it is a corporation without capital stock having a board of directors and the usual corporate officers; that regular meetings of the members are held semiannually and special meetings may be called as may be necessary; and that its membership is limited to women and girls over twelve years of age who express an interest in belonging to the Y.W.C.A. and who pay the required membership fee, although men and boys who pay certain fees may become "Y.W.C.A. Associates", who, while they are not considered members of the Y.W.C.A. and have no voting rights at meetings, nevertheless acquire a status within the organization entitling them to participate in certain Y.W.C.A. programs and to attend members' meetings.

### (b)

The principal use actually to be made of the property must be determined by the evidence before the board. The Y.W.C.A. contemplates no substantial change in its activities, and thus the proposed principal use is largely to be determined by its present purposes and activities. See cases such as *Shulman* v. *Zoning Board of Appeals,* supra, 431.

The articles of association state that the purposes of the Y.W.C.A. are to develop the highest conception of Christian womanhood and to aid women by bringing to them opportunities for all-around development. There was evidence that the Y.W.C.A.

program includes classes in academic subjects, such as French and Bible study, in homemaking subjects, such as cooking and sewing, and in physical education subjects, such as tennis and swimming. There are also numerous "special interest" groups, or subordinate clubs, such, for instance, as bridge and rug hooking clubs, and a "World Friendship" club for newcomers to the United States. The board could reasonably have concluded, as it did, that the Y.W.C.A. uses its facilities, and proposes to use them, for recreational, educational, and religious purposes. The fact that the purposes of the Y.W.C.A. in part are "educational" and in part, in a broad sense, charitable, does not make its principal use of its facilities that of an "educational institution", nor, as the plaintiffs seem to claim, that of a "charitable institution" under subdivision (d) of § 6 (a) (2). Section 6, by its express terms, is concerned with the "principal use" by the Y.W.C.A. of its proposed new facilities, not with its subordinate or occasional use or uses of those facilities. *Fox* v. *Zoning Board of Appeals,* 146 Conn. 70, 75, 147 A.2d 472.

From the evidence before the board of the existing program of the Y.W.C.A. and of its plans for the new facilities and their uses, the board could reasonably have concluded that the proposed facilities would be used principally as a club, within the meaning of § 6 (a) (2) (b).

(c)

Section 6 (a) (2) (b) imposes two limitations on clubs permitted as special exceptions. They may not be open to the general public, and they may not be operated for commercial profit. No claim has been made that the Y.W.C.A. facilities will be

operated for commercial profit. But some claim was made that the uses of the building by the Y.W.C.A. would be open to the general public. That some activities of the Y.W.C.A. are open to non-members seems clear. But in general, use of its facilities is restricted to its members, who pay membership fees. Although no discriminatory restrictions based on race, creed, or status in life are imposed on membership, the members comprise no substantial portion of the general public of the area.

In this connection it must not be overlooked that § 6 of the zoning regulations, by its express terms, is concerned only with "principal" uses, permitting such "principal" uses as are enumerated therein, and expressly prohibiting all other "principal" uses. From the use of the word "principal" in § 6 (a), as hereinbefore quoted, it is obvious that the regulation expresses no intent that subordinate or occasional uses, even if outside the scope of the principal uses expressly allowed, will bar the granting of a special exception. Thus, the mere fact that the Y.W.C.A. proposes to make some use of its facilities for the betterment and welfare of the general public of the Greenwich area, as well as for its members, did not require the board to conclude that the principal uses of the proposed facilities would be open to the general public, nor, we may add, does it require a conclusion that the Y.W.C.A. was a "charitable institution". There was nothing unreasonable in the board's conclusion that the proposed principal uses would not be open to the general public within the meaning of § 6 (a) (2). *Fox* v. *Zoning Board of Appeals,* supra.

The board's conclusion that the Y.W.C.A. was a club within the meaning of the zoning regulations

authorizing special exceptions was not erroneous. *Von Kohorn* v. *Morrell,* 9 N.Y.2d 27, 34, 172 N.E.2d 287.

## II

The plaintiffs further claim that the board acted illegally in concluding that the Y.W.C.A. "meets all the specified standards." Although the specific standards in § 28 (b) (3) are set forth in six paragraphs, some are clearly inapplicable to a special exception granted to a club. The plaintiffs have briefed their claim only with regard to subparagraph (e), which requires the board to find that a proposed use "[w]ill not be detrimental to the neighborhood or its residents or alter the neighborhood's essential characteristics." The word "neighborhood" of course refers to the neighborhood of the subject property which, as already noted, fronts on the Boston Post Road.

It is clear from the minutes of the board's meeting that the board gave careful consideration to this standard. Indeed, the board, as authorized by § 28 (b) (3) of the regulations, imposed conditions and safeguards requiring the location of the building near the front of the lot, requiring new planting, as well as the retention of existing planting, especially in the rear of the property, and limiting the hours of use of the facilities. Thus, the proposed building will be located on the front half of the lot, facing the Boston Post Road, where it will be close to quasi-public buildings, including two churches, a synagogue, the American Red Cross building and the Israel Putnam Historical Museum, and near a large, new high school. The architect testified that he designed the proposed building to be consistent with the neighboring buildings, that insofar as pos-

sible he had divided the building into small units, and that the lower floor was below grade to reduce the apparent height of the building. He pointed out that the entrances and exits opened onto interior courts screened from the neighbors to muffle the sounds of groups leaving the building and that the parking area was divided into zones to preserve existing trees and natural undergrowth for screening and to provide control of traffic.

While there was evidence of residential property lying back from the Boston Post Road, the rear of which abutted the rear portions of the Y.W.C.A. property, and that a nonconforming multifamily dwelling abutted the subject tract on the east, the board, as it explained, carefully took all this into consideration in fixing its conditions and safeguards.

The board's conclusion that the granting of a special exception, conditioned as was this, and covering property on the Boston Post Road, would not be detrimental to the neighborhood or alter its essential characteristics, cannot be disturbed. There is nothing to indicate that the board did not consider and follow the other applicable specific standards of § 28 (b) (3). In short, its conclusion that the special exception, as conditioned, "meets all the specified standards" was a reasonable conclusion for it to draw.

### III

The plaintiffs claim that, because § 6 (a) (2) allows, in residential zones, a variety of uses as special exceptions, the section is invalid as an abdication to the board of appeals of the power to zone. They also claim invalidity because of the insufficiency of the standards governing the granting of special exceptions.

### (a)

The short answer to the first claim is that § 6 (a) (2), and not the board, determines what uses may be allowed as special exceptions. The function of the board in this connection is to determine whether or not a proposed use falls within one of the special exceptions expressly permitted by the regulation. *Connecticut Sand & Stone Corporation* v. *Zoning Board of Appeals,* 150 Conn. 439, 442, 190 A.2d 594.

### (b)

In determining whether or not the board should permit a particular enumerated special exception on a given site, the board is controlled by the standards set forth, in terms, or by incorporation by reference, in § 28 (b) (3). In addition to the requirement in subdivision (e) already discussed, the board, before granting a special exception, is required, inter alia, to determine that the proposed use (subdivision [a]) will not create a traffic hazard or traffic congestion, nor hamper the pattern of highway circulation; and (subdivision [c]) will not create a nuisance because of noise, glare or atmospheric pollutants. There is no reason to question that the board, as it said, gave consideration to these specific applicable requirements, as well as to the broader requirements that it impose appropriate conditions and safeguards in accordance with the public interest and the comprehensive plan and in harmony with the objectives of zoning as set forth, in extenso, in § 1 of the zoning regulations.

Although no two sets of zoning regulations controlling a board's power to grant special excep-

tions are identical, claims substantially similar to those made by the plaintiffs in this case were rejected in *St. John's Roman Catholic Church Corporation* v. *Darien,* 149 Conn. 712, 720, 184 A.2d 42. See also *Miklus* v. *Zoning Board of Appeals,* 154 Conn. 399, 402, 225 A.2d 637.

## IV

Finally, the plaintiffs charge that the broad range of special exceptions permitted under § 6 (a) (2) allows the board to practice spot zoning.

In a sense nearly any special exception can be loosely and inaccurately termed spot zoning, since it authorizes the particular property to be used for a purpose not permitted to surrounding property in the same zone for which no special exception has been granted. But there is no merit in the claim that a special exception granted, as was this, in conformity with the express terms of the zoning regulations, is illegal as spot zoning. If this claim were correct, almost any provision authorizing the granting of a special exception would be illegal, which of course is not the law.

## V

In conclusion, it may be well to point out that any claim that property abutting the Boston Post Road, at least in the immediate neighborhood of the subject tract, is desirable residential property might well be rejected by the board as factually unsound. But because of the power to grant special exceptions, utilization of such property for quasi-public buildings such as already are in the area in question and buildings such as the Y.W.C.A. proposes to erect, has successfully obviated any need of rezoning the area for commercial use. If

the plaintiffs' properties, the rear lines of which abut the rear portions of the subject tract, are, as the plaintiffs claim, truly residential, they are at the edge of desirable residential property and thus are "liners", at best, and, under the circumstances, are well protected by the zoning system provided. The system also grants similar desirable protection to the tracts occupied by the quasi-public buildings. *Von Kohorn* v. *Morrell*, 9 N.Y.2d 27, 34, 172 N.E.2d 287. The plaintiffs are indeed fortunate that they have received such careful consideration from the board in the imposition of the conditions and safeguards which were established.

The other claims of the plaintiffs do not require discussion.

There is no error.

In this opinion the other judges concurred.